IN THE DISTRICT COURT OF WYANDOTTE COUNTY KANSAS

| | |
|---|---|
| TAMATHA HENNESSEY | ) |
| PLAINTIFF | ) |
| Vs. | ) |
| UNIVERSITY OF KANSAS | ) |
| HOSPITAL AUTHORITY. | ) |
| DEFENDANT | ) |

2:21-02231-EFM-TJJ

**FILED**

MAY 19 2021

TIMOTHY M. O'BRIEN CLERK
By: _____ Deputy

### PETITION FOR DAMAGES

**COMES NOW** Plaintiff, alleges and states the following causes of action Defendant University of Kansas Hospital Authority (hereinafter referred to as "KUHA").

### THE PARTIES

1. Plaintiff Tamatha Hennessey is a resident of the State of Missouri residing at 16313 Spring Valley Road, Belton, MO 64012.

2. At all times hereto, Defendant KUHA is and was a corporate entity established by law that operates the hospital located at 4000 Cambridge Street, Kansas City, Kansas 66106.

3. At all times relevant hereto, KUHA was acting by and through its agents, servants and/or employees actual or ostensible, each of whom was acting individually and within the course and scope of their employment with KUHA. Defendant KUHA is liable for the actions and/or omissions described herein under the laws of the State of Kansas and of the principle of vicarious liability and/or 'respondeat superior'.

4. Pursuant to Kansas law, KUHA shall assume responsibility for and in doing so, shall defend, indemnify and hold harmless the regents and the University of Kansas and its officers and directors with respect to claims related to the authority's errors and

1

omissions including, but not limited to; Medical malpractice; directors' and officers' liability; workers' compensation; automobile liability; and premises, completed operations and products liability.

## JURISDICTION AND VENUE

5. Jurisdiction is proper because Defendant is a Kansas corporation and/or entity operating a hospital located in Kansas City, Wyandotte County, Kansas.

6. Venue is proper in this Court pursuant to K.S.A 60-604 in that all acts alleged herein took place in Wyandotte County, Kansas.

## GENERAL ALLEGATIONS REGARDING FACTS COMMON TO ALL COUNTS

7. At all times relevant herein, Plaintiff Hennessey was a patient at KUHA and was owed a duty of ordinary care by KUHA and all of its employees. Among Defendant KUHA's duties to Plaintiff were all of the following:

    (a) Doing no harm.

    (b) Providing medical treatment for Plaintiff within applicable standards of care.

    (c) Hiring competent, capable, and law-abiding employees with quality background check results.

    (d) Training its employees properly.

2

    (e)    Supervising and monitoring its employees in the performance of their duties.

    (f)    Disciplining its employees properly.

    (g)    Providing reasonable security at the hospital to protect patients from any and all employee negligence

    (h)    Terminating employees who abuse and/or neglect patients.

    (i)    Generally managing its employees in the performance of their duties, and

    (j)    Other ways that are expected to be revealed during the discovery of this case.

KUHA is part of the University of Kansas Health System and as an adult, Plaintiff Tamatha Hennessey, had the right to;

    a. Respectful care;

    b. Participation in her care decisions:

    c. Security and treatment in the least restrictive way that preserves her safety and that of other patients and hospital staff.

8.    Plaintiff had a right to respectful care given by competent personnel while she was a patient at KUHA.

9.    Defendant KUHA had an employer-employee relationship with Jonathan McIntire (Radiology Technologist) and, therefore, had a duty to control and/or supervise

3

Jonathan McIntire even if Jonathan McIntire was acting outside the scope of his employment.

10. Defendant KUHA had a duty to prevent Jonathan McIntire from intentionally harming patients and/or from conducting himself in such a way as to create an unreasonable risk of bodily harm or psychological injury to patients.

11. Defendant, KUHA allowed/authorized Jonathan McIntire to be alone with a female sedated plaintiff in the hospital without chaperone or supervision for an excessive period of time (i.e. several hours).

12. On February 12, 2019, between 1600 and 1900, Plaintiff Tamatha Hennessey went to the emergency room at KUHA with complaints of severe right shoulder and left jaw pain, and severe anxiety from the pain.

13. Plaintiff told the emergency room nurse that she has been experiencing excruciating pain in her right shoulder during the past two weeks as follows;

---

**THE UNIVERSITY OF KANSAS HOSPITAL**
3901 Rainbow Blvd.
Kansas City KS 66160
KUHA Entire Chart

Hennessey, Tamatha LYNN
MRN: 1337593, DOB: [redacted], Sex: F
Acct #: [redacted]
Adm: 2/13/2019, D/C: 2/13/2019

**ED PROVIDER NOTE (continued)**
ED Provider Notes by Glauner, Kathi, MD at 02/13/19 1640 (continued)
Electronically signed by Miller, Danielle J, MD at 02/14/19 2128
Electronically signed by Glauner, Kathi, MD at 02/15/19 0622
Electronically signed by Glauner, Kathi, MD at 02/15/19 0622

**ED Notes**
ED Notes by Raya, Heather, RN at 02/13/19 0259
Author  Raya, Heather, RN          Service —                          Author Type  RN
Filed   02/13/19 0309              Creation Time  02/13/19 0309       Status  Signed
Editor  Raya, Heather, RN (RN)

47 yo female to ED38 with severe anxiety d/t her CC of 9/10 right "splitting" shoulder pain that began to become "excrutiating" 2 weeks ago. Pt denies trauma to shoulder. Pt reports feeling "very sickly; my shoulder feels like it is coming apart, I have fevers and chills." Pt also presenting with 9/10 left sided jaw pain "that seems like it is swelling" that started today. pt has Hx of cervical fusion and developed osteomyelitis which she was treated for and hospitalized for "four and a half months." Highest fever at home 104.2 F; pt afebrile in triage. Pt reports that "the only thing I can think of is osteomyelitis." Pt reports "puss pockets in my nose." Pt reports "puss pocket under/inside upper lip; pt reports "busting the puss pocket" earlier and seeing red and white puss; pt wears upper dentures. Pt reports hx of kyphosis; double hernia 1987. ectopic pregnancy 1991, severe anxiety. Pt reports SOB chest pain with her nausea, fevers and dizziness; EKG performed in triage. Pt on bp, cardiac, and spo2 monitors, VSS, bed in lowest locked position, call light in reach. Awaiting MD evaluation.

4

14. Plaintiff was examined by nurse practitioner, Katherine Lysaught, APPRN-NP, who ordered an MRI of Plaintiff's right shoulder and a CT Scan of her cervical spine.

15. While in the emergency room, Plaintiff was given a lidocaine patch, Motrin and some Ativan to help her calm down and relax.

16. The Ativan made the Plaintiff very sleepy and out of it.

17. At approximately 8:58 a.m., Jonathan McIntire received an order to perform an MRI of Plaintiff's right shoulder and a CT-Scan of her cervical spine.

18. At approximately 8:58 a.m., Jonathan McIntire went to Plaintiff's room and let her know that she would be with him for about 60-90 minutes.

19. Jonathan McIntire transported Plaintiff in a hospital bed from the emergency room to a remote and secluded radiology room that was located in the new part of the hospital.

20. It took approximately 10=15 minutes for Jonathan McIntire to transport Plaintiff to the radiology room and felt like forever to the patient.

21. Jonathan McIntire chose to take Plaintiff to the new part of the hospital instead of using a radiology room that was located closer to the emergency room.

22. When they arrived at the radiology room, Jonathan McIntire had to turn on the lights in the room and was alone with the Plaintiff, which made the Plaintiff uncomfortable.

23. After entering the radiology room, Jonathan McIntire handed Plaintiff another gown and pants and asked her to remove the Emergency Room hospital gown and pants that she was wearing and change into another similar gown and pants in his presence without a chaperone.

24. There was no difference between the hospital gown and pants that Plaintiff was wearing and the hospital gown and pants that McIntire provided to Plaintiff.

25. Jonathan McIntire did not leave the radiology room after telling the Plaintiff to change her clothing.

26. Jonathan McIntire did not explain why Plaintiff needed to change into a different, but similar hospital gown and Plaintiff felt uncomfortable doing so while Jonathan McIntire was in the room with her alone.

27. Jonathan McIntire then asked Plaintiff to make a music selection.

28. Plaintiff was in a lot of pain and very sleepy from the Ativan and told Jonathan McIntire that any music would be fine.

29. Jonathan McIntire then appeared to be angry with Plaintiff and got into her face and said "you need to pick a song", in a rude and rough manner.

30. This scared the Plaintiff and made her extremely uncomfortable.

31. Plaintiff then told Jonathan McIntire that "Enchanted Gardens" is what I play for my dog.

32. Jonathan McIntire told Plaintiff that it was very important for her to be relaxed at that point.

33. Jonathan McIntire then said to Plaintiff, "do you know what the best kind of patient is...a dead patient".

34. At this point in time, Plaintiff was scared and extremely intimidated by Jonathan McIntire.

35. Jonathan McIntire proceeded to strap both of Plaintiff's arms down onto the MRI table and then strapped her legs down as well.

36. Plaintiff closed her eyes and tried to stay as calm as she could, but was extremely scared and believed that Jonathan McIntire was going to hurt and/or kill her.

37. After Jonathan McIntire strapped Plaintiff onto the MRI table, placed a wedge cushion under her chin area preventing her from seeing what he was doing to her body and maneuvered Plaintiff's head and shoulder into the MRI machine. Jonathan McIntire placed headphones over Plaintiff's ears, turned the MRI machine on and Plaintiff started to fall asleep.

38. Plaintiff was awakened to Jonathan McIntire pinching her nipples very hard while she was still strapped down.

39. Plaintiff was frozen and felt completely helpless and acted like she was still asleep out of fear that he would kill her if she said anything.

a. Jonathan McIntire pinched and groped one breast at a time moving from right to left and from left to right.

b. Then Jonathan McIntire put his mouth over Plaintiff's breasts.

c. Plaintiff was in a state of shock and could not move or do anything to stop Jonathan McIntire from this horrendous and humiliating sexual assault.

d. Plaintiff started crying as quietly as she could while Jonathan McIntire took advantage of her and the situation that she was in, without any interference and/or protection from KUHA, Mr. McIntire's supervisor, security and/or any other employee of the hospital.

e. Although it should not have taken more than one hour for these radiologic studies to be completed, Jonathan McIntire documented in the medical records that he received this order at 8:58 a.m. and that he didn't complete his work until 12:58 p.m.

f. Although Jonathan McIntire had control over Plaintiff for approximately four hours, no one, including from the Radiology Department or Emergency Room staff checked on the Plaintiff to assure that Plaintiff was safe and/or to assure that Jonathan McIntire was doing his job in a safe and responsible manner.

g. At all times during the aforementioned emergency visit, KUHA and its employee, Jonathan McIntire, owed Plaintiff a duty to exercise ordinary care to assure that Plaintiff was safe and secure in the hospital.

h. Defendant KUHA failed to provide Plaintiff with safety and security while she was a patient at KUHA pursuant to the AMA Code of Ethics.

i. Defendant KUHA had a fiduciary duty to the patients in their care and specifically to Plaintiff, to protect them and her from the sort of misconduct which occurred in this situation.

j. The actions and omissions of Defendant KUHA directly contributed to cause Plaintiff to suffer physical injury, as described hereinabove, and also emotional distress in the form of anxiety, fear, depression, humiliation, and other manifestations.

## COUNT I—NEGLIGENT SUPERVISION

k. Plaintiff hereby incorporates the allegations set forth throughout this Petition into this particular Count as though fully set forth herein.

l. Defendant KUHA had the responsibility to ensure safety and care of the Plaintiff. Defendant KUHA was vicariously responsible for the sexual assault of the Plaintiff by not checking on her welfare after being absent from the emergency room for three to four hours.

m. This negligence by Defendant KUHA directly caused or directly contributed to cause Plaintiff to suffer these injuries and damages.

n. Defendant KUHA at all times had the duty to supervise competent, capable, law abiding persons to work with its patients.

o. Defendant KUHA should have more closely monitored its male radiology technologists when providing care treatment to a sedated female patient and

9

not allowed to be alone together in a remote radiology room and/or Defendant should have known that something wasn't right when Plaintiff was taken to a remote radiology room in the hospital and/or when Plaintiff was not returned to her room within the normal time (i.e. one hour as opposed to the 3 to 4 hours that Plaintiff was under the control of the radiologist) that would have taken to perform the MRI and CT-Scan.

**WHEREFORE,** Plaintiff prays for an award of damages against Defendant KUHA in an amount to be determined by the jury together with interest and costs of suit and for such other relief as is just and proper.

### DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues set forth herein.

**TAMATHA HENNESSEY**

*Tamatha J. Hennessey*   5-18-21

TAMATHA HENNESSEY

16313 SPRING VALLEY RD

BELTON, MO  64012

816-425-5425