FILED
United States Court of Appeals
Tenth Circuit

January 2, 2026

Christopher M. Wolpert
Clerk of Court

UNITED STATES COURT OF APPEALS

FOR THE TENTH CIRCUIT

---

TAMATHA HENNESSEY,

    Plaintiff - Appellant,

v.

UNIVERSITY OF KANSAS HOSPITAL
AUTHORITY,

    Defendant - Appellee.

No. 24-3163
(D.C. No. 2:21-CV-02231-EFM)
(D. Kan.)

---

### ORDER AND JUDGMENT[*]

Before **HOLMES**, Chief Judge, **TYMKOVICH**, and **MORITZ**, Circuit Judges.

---

Tamatha Hennessey brought this action against the University of Kansas Hospital Authority (UKHA), alleging that a hospital employee sexually assaulted her during a radiologic procedure. She claimed UKHA negligently failed to supervise the employee. The district court granted summary judgment to UKHA, reasoning that Hennessey had not established a genuine factual issue about whether the assault

---

[*] After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist in the determination of this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument. This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

was foreseeable to UKHA. Hennessey appeals pro se from the district court's judgment.[1] We have jurisdiction, see 28 U.S.C. § 1291, and we affirm.

## BACKGROUND

### 1. *UKHA and its employee, McIntire*

UKHA is a Kansas governmental entity that is charged with operation of the University of Kansas Hospital (Hospital). During the events relevant to this dispute, UKHA employed Jonathan McIntire as an MRI technician at the Hospital.

### 2. *Hennessey's MRI*

On February 12, 2019, Hennessey arrived at the Hospital's emergency department presenting a variety of complaints, including chest, shoulder, and jaw pain. Early the next morning, she underwent x-rays of her chest and right shoulder. Later that morning, a doctor ordered MRIs of her cervical spine and right upper extremity.

Hennessey requested to be sedated during the procedure. A Hospital nurse gave her an intravenous dose of Ativan, a benzodiazepine drug, to prepare her for the MRI.

Around 9:45 a.m., McIntire transported Hennessey to the MRI machine. During the MRI procedures, he was alone with Hennessey. He performed four MRI procedures. According to the MRI report he had to repeat some of the imaging sequences because the images showed her moving during the procedures. The last

---

[1] We liberally construe Hennessey's pro se filings, but we do not act as her advocate. See *Luo v. Wang*, 71 F.4th 1289, 1291 n.1 (10th Cir. 2023).

MRI image was completed at 12:39 p.m. Surveillance camera footage shows him transporting her back to the emergency department at 1:08 p.m.

After Hennessey returned to the emergency department, a hospital social worker visited her to complete a discharge planning assessment, but Hennessey was asleep and could not wake up enough to speak with the social worker. She later assisted in completing the discharge paperwork and was discharged from the Hospital at 3:39 p.m. During the discharge process she did not make any accusations of inappropriate conduct against McIntire.

### 3. *The criminal proceedings against McIntire*

Hennessey later filed a report with the University of Kansas police, claiming that McIntire had assaulted her. He was charged with a felony in Kansas district court. Hennessey testified at his preliminary hearing that she was in and out of consciousness during the MRI procedure, but at one point she awoke to find McIntire fondling her breasts and touching them with his mouth. Hennessey asserts that DNA evidence supports her testimony.

McIntire denied Hennessey's allegations. He stated during his deposition testimony that the only contact he would have had with Hennessey's breasts would have been incidental when he removed five EKG leads with potentially ferrous materials prior to performing the MRIs. Before McIntire's criminal trial could take place, the State of Kansas dismissed all charges against him.

4. *Procedural history of this action*

After an initial filing in state court that she voluntarily dismissed, Hennessey filed a pro se complaint in the District of Kansas, advancing a single claim against UKHA of negligent supervision under Kansas law. The action proceeded under the court's diversity jurisdiction.

UKHA filed a motion to dismiss. It asserted Eleventh Amendment immunity as an arm of the state. *See Hennessey v. Univ. of Kan. Hosp. Auth.*, 53 F.4th 516, 527-28 (10th Cir. 2022) (discussing scope of Eleventh Amendment immunity). UKHA also argued that as an instrumentality and arm of the state of Kansas it was not a citizen of any state for purposes of diversity jurisdiction. UKHA did not present any factual support for its arguments and did not analyze the factors governing whether it was an arm of the state.

The district court nevertheless dismissed the action, finding after a sua sponte analysis of the relevant factors that UKHA was an arm of the state and therefore immune from Hennessey's suit. Hennessey appealed. We concluded that it was UKHA's burden to demonstrate it was an arm of the state, *id.* at 531, and that UKHA had failed to meet its burden with appropriate facts and argument, *see id.* at 525, 542. In particular, "the district court erred in concluding that UKHA is not autonomous under the language of the University of Kansas Hospital Authority Act [UKHAA]." *Id.* at 524. We therefore vacated the dismissal and remanded for further proceedings. *Id.* at 542-43. We stated that on remand, UKHA could "opt to renew its [Fed. R. Civ.

4

P.] 12(b) motion or to file an answer so the case may proceed to the next step in litigation." *Id.* at 543.

On remand, UKHA filed an answer to Hennessey's complaint, followed by its motion for summary judgment in which UKHA raised several other defenses to her claim, including sovereign immunity under state law. The district court granted summary judgment to UKHA on one of these defenses: that Hennessey had failed to establish a genuine issue of material fact concerning the foreseeability to UKHA of McIntire's alleged assault.

**DISCUSSION**

"We review summary judgment decisions de novo, applying the same standard as the district court." *Mauldin v. Driscoll*, 136 F.4th 984, 993 (10th Cir. 2025). A district court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). We can affirm summary judgment on any ground adequately supported by the record, so long as the appellant has had a fair opportunity to address the alternative ground. *Lowther v. Children Youth & Fam. Dep't*, 101 F.4th 742, 760 (10th Cir. 2024).

"When, as here, a federal court is exercising diversity jurisdiction, it must apply the substantive law of the forum state," which in this case is Kansas. *N.H. Ins. Co. v. TSG Ski & Golf, LLC*, 128 F.4th 1337, 1344 (10th Cir. 2025). We review questions of state law de novo, with the goal of either applying the most recent

5

statement of the Kansas Supreme Court on an issue or predicting how the Kansas Supreme Court would rule on the issue if presented to it. *Id.* at 1344-45.

### 1. Jurisdictional Issues

This case presents threshold jurisdictional issues. We review questions concerning subject-matter jurisdiction de novo. *See, e.g.*, *Interstate Med. Licensure Compact Comm'n v. Bowling*, 113 F.4th 1266, 1273 (10th Cir. 2024).

#### A. Eleventh Amendment immunity

In our previous decision we did not ultimately determine whether UKHA was an arm of the state. We left that issue to the district court on remand. *Hennessey*, 53 F.4th at 543. But on remand UKHA chose not to reassert an Eleventh Amendment defense and instead raised other defenses on summary judgment, including sovereign immunity based on the Kansas Tort Claims Act (KTCA). *See, e.g.*, *Jones v. Kan. Dep't of Corr.*, 376 P.3d 774, 776 (Kan. Ct. App. 2016) (distinguishing between Eleventh Amendment immunity and sovereign immunity as codified in the KTCA). Nor does UKHA attempt to re-assert an Eleventh Amendment defense on appeal. Although Eleventh Amendment immunity is jurisdictional, it may be waived. *See Hennessey*, 53 F.4th at 527. By abandoning its Eleventh Amendment argument without presenting additional facts on that issue as we contemplated, UKHA waived its assertion of Eleventh Amendment immunity.

#### B. Diversity jurisdiction

In our previous decision we also discussed UKHA's argument that if it was an arm of the state, diversity jurisdiction would be lacking. *See Hennessey*, 53 F.4th at

6

531-32 (noting that a state and its arms or alter egos are not "citizens" of any state for diversity purposes). But we placed the burden with UKHA to support its diversity-based argument by demonstrating factually that it is an arm of the state. *Hennessey*, 53 F.4th at 532. By abandoning its "arm of the state" argument without further factual development, UKHA presented at most a facial rather than a factual attack on diversity jurisdiction. Such an attack requires us to look at the face of the complaint and to accept its allegations as true. *Graff v. Aberdeen Enterprizes, II, Inc.*, 65 F.4th 500, 507 (10th Cir. 2023). We already did so, and we found them sufficient to invoke diversity jurisdiction in the federal courts. *See Hennessey*, 53 F.4th at 542 n.13; *see generally Moor v. Cnty. of Alameda*, 411 U.S. 693, 717 (1973) ("[A] political subdivision of a State, unless it is . . . the arm or alter ego of the State, is a citizen of the State for diversity purposes." (internal quotation marks and footnote omitted)), *overruled on other grounds by Monell v. N.Y. City Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978). We therefore have no further basis to inquire into diversity jurisdiction here.

### 2. Sovereign immunity under the KTCA

In its summary judgment motion, UKHA raised a sovereign immunity defense, providing several reasons why it had not waived its immunity under the Kansas Tort Claims Act (KTCA). The district court did not address this sovereign immunity issue, and instead resolved the case on the merits. But under Kansas law sovereign immunity is jurisdictional, *see, e.g., Purvis v. Williams*, 73 P.3d 740, 750 (Kan. 2003), and "courts are compelled to address it," *State ex rel. Schmidt v. Nye*,

7

440 P.3d 585, 589 (Kan. Ct. App. 2019). We therefore consider whether sovereign immunity bars Hennessey's claim.

The sovereign immunity inquiry in this case requires us to answer two questions: (1) is UKHA a governmental entity that may benefit from sovereign immunity? and (2) if so, has the KTCA waived that immunity for Hennessey's claim?

### A. UKHA is a governmental entity.

In Kansas, sovereign immunity extends to governmental entities, *Zaragoza v. Bd. of Comm'rs*, 571 P.3d 545, 553 (Kan. 2025), including both the state and municipalities, Kan. Stat. Ann. § 75-6102(c). The state includes "the state of Kansas and any department or branch of state government, or any agency, authority, institution or other instrumentality thereof." *Id.* § 75-6102(a). Municipalities include "any county, township, city, school district or other political or taxing subdivision of the state, or any agency, authority, institution or other instrumentality thereof." *Id.* § 75-6102(b).

Hennessey argues UKHA is "simply a hospital" rather than a governmental entity. Aplt. Opening Br. at 5. We disagree.[2] Under the UKHAA, UKHA is an instrumentality of the state of Kansas that performs "an essential governmental

---

[2] We also disagree that our prior decision established that UKHA is not a governmental entity. To the contrary, we assumed that the UKHAA potentially provided "a sufficient basis to resolve" UKHA's "characterization" in favor of Eleventh Amendment immunity, even if other immunity factors had not been resolved. *Hennessey*, 53 F.4th at 533.

8

function." *See* Kan. Stat. Ann. § 76-3304(a).  And the UKHAA specifically provides that UKHA is subject to the KTCA.  *See id.* § 76-3315.

### B. The KTCA's discretionary function exception applies.

The KTCA waives sovereign immunity for a governmental entity sued "'for damages caused by the negligent or wrongful act or omission of any of its employees while acting within the scope of their employment under circumstances where the governmental entity, if a private person, would be liable under the laws of this state.'" *Hill v. State*, 448 P.3d 457, 469 (Kan. 2019) (quoting Kan. Stat. Ann. § 75-6103(a)).  Hennessey's negligent supervision claim relies on direct, rather than vicarious liability.  *See, e.g.*, *Estate of Belden v. Brown Cnty.*, 261 P.3d 943, 967 (Kan. Ct. App. 2011) (stating theories of liability based on negligent hiring, training, and supervision "impose direct liability on an employer or policymaker rather than vicarious liability for the misconduct of an underling").  Because the KTCA "essentially subject[s] governmental entities to vicarious liability under the doctrine of respondeat superior," *Schreiner v. Hodge*, 504 P.3d 410, 422 (Kan. 2022), UKHA reasons the KTCA does not waive sovereign immunity for a direct-liability claim based on negligent supervision, like Hennessey's claim.[3]

---

[3] Hennessey appears to agree with UKHA's premise but draws a contrary conclusion from it.  She argues that if her negligent supervision claim does not fall within the KTCA, UKHA cannot assert a sovereign immunity defense against that claim.  But her argument rests on a misunderstanding of how the KTCA works.  At early common law, the state of Kansas and its political subdivisions had blanket immunity from civil actions.  *See Zaragoza*, 571 P.3d at 553.  The KTCA, adopted in 1979, modified this common-law doctrine to "permit[] individuals to bring tort claims against all state and local governmental entities, subject to the limitations of

9

We need not resolve this issue, because even assuming the KTCA applies, UKHA argues that Hennessey's claim is barred by its discretionary function exception. The KTCA's discretionary function exception provides that "[a] governmental entity or an employee acting within the scope of the employee's employment shall not be liable for damages resulting from . . . any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a governmental entity or employee, whether or not the discretion is abused and regardless of the level of discretion involved." Kan. Stat. Ann. § 75-6104(a)(5).

UKHA argues that Hennessey's negligent supervision claim, which targets UKHA's exercise of discretion in supervising McIntire—including the need for policies concerning chaperoning patients or otherwise protecting them from assault by treating providers—falls within the discretionary function exception. *See* Aplee Br. at 29-33. Hennessey has not adequately developed an argument to the contrary.[4] We therefore affirm the grant of summary judgment to UKHA based on its argument that the discretionary function exception of the KTCA applies.

---

the act." *Id.* Absent a claim that fits within the KTCA, no such permission to sue a state entity is made available by the statute.

[4] In her reply brief, Hennessey asserts that "Kansas courts hold that where mandatory protocols exist or should exist (e.g., requiring a chaperone during vulnerable procedures), the discretionary function defense does not apply." Reply Br. at 7. This single-sentence argument is not adequately developed, and we therefore decline to consider it. *See Bronson v. Swensen*, 500 F.3d 1099, 1104 (10th Cir 2007) (this court will not consider inadequately briefed arguments).

10

### 3. Alternatively, we affirm summary judgment on the merits.

Alternatively, we affirm the district court's decision on the merits.  Under Kansas law, "[w]hen a third party asserts a negligent retention and supervision claim against an employer, liability results . . . [if] the employer had reason to believe that an undue risk of harm to others would exist as a result of the employment of the alleged tortfeasor."  *Kan. State Bank & Tr. Co. v. Specialized Transp. Servs., Inc.*, 819 P.2d 587, 598 (Kan. 1991).  Ordinarily, "[w]hether risk of harm is reasonably foreseeable is a question to be determined by the trier of fact," but a court may determine the question as a matter of law "when reasonable persons could arrive at but one conclusion."  *Beshears ex rel. Reiman v. Unified Sch. Dist.*, 930 P.2d 1376, 1384 (Kan. 1997) (internal quotation marks omitted).

UKHA argued in district court that it was entitled to summary judgment because Hennessey had presented no evidence of McIntire's allegedly dangerous propensities or that UKHA knew or should have known of those alleged propensities.  Hennessey countered that UKHA could also be liable if she showed it was reasonably foreseeable that a sexual assault could occur on UKHA's premises, irrespective of McIntire's individual propensities.  Like the district court, we find it unnecessary to determine whether Kansas courts would apply the broader standard Hennessey advances, "because even considering [her] evidence, it does not create a genuine issue of material fact as to foreseeability."  R. at 1016.

No genuine factual issue exists about whether McIntire's alleged assault was reasonably foreseeable to UKHA.  First, UKHA had no reason to foresee that

11

McIntire in particular would act outside his employment duties by committing a sexual assault on a patient. He was licensed by the Kansas Board of Healing Arts as a radiologic technologist. To become licensed, he underwent an education and employment verification and a criminal history record check. When hiring him, UKHA used a third-party agency to perform a background check concerning his education, employment, and criminal history. The agency verified his information and reported that he had no known criminal history. And until the events involving Hennessey, UKHA had received no reports or complaints about sexually inappropriate conduct involving McIntire.

Hennessey argues the sexual assault was reasonably foreseeable for reasons that go beyond Hennessey's personal history or characteristics. She contends the structural conditions involving her procedure (her isolation in a remote part of the hospital with McIntire for several hours when she was under the influence of a prescribed sedative drug) should have alerted UKHA that sexual assault was a possibility and that it needed to provide closer supervision of McIntire and the procedure.[5] She also argues that UKHA was on notice that such an attack was

---

[5] Hennessey argues that the length of time it took to complete her MRI scan should have alerted UKHA that something had gone wrong. But she does not cite evidence about the typical time frame required to complete the MRI procedure. Moreover, UKHA explained that completion of the procedure was delayed because it was necessary to re-do some of the images, and it provided a detailed chronology of the MRI scan in its motion for summary judgment, *see* R. at 698-99, detailing the time frame for each portion of the procedure, which Hennessey did not contest. She fails to show that a delay in completing the procedure, even together with the other structural factors she cites, made a sexual assault reasonably foreseeable to UHKA.

12

foreseeable because fifteen months before her assault a different patient was assaulted in a different part of the hospital by a different employee.  Finally, she asserts that UKHA had a statutory duty under Kan. Stat. Ann. § 65-2837(b)(30) to properly supervise McIntire pursuant to its Code of Conduct.

None of these factors made the attack reasonably foreseeable.  The fact that McIntire's employment allowed him to be alone for an extended time with a sedated patient does not indicate that a sexual assault was a reasonably foreseeable result of his employment.  As the district court reasoned, an earlier isolated incident consisting of an attack in a different area of the hospital by a different type of employee did not give UKHA reason to anticipate McIntire's alleged sexual assault. [6]  The cited statute merely explains that UKHA had a duty to properly supervise persons who performed professional services, not that the harm was foreseeable.  As for the Code of Conduct, Hennessey's citation indicates that UKHA's policies prohibit violation of federal, state, or local laws and regulations—not that a sexual assault violating such laws was foreseeable to UKHA.

---

[6] Hennessey argues that the prior incident involved an emergency department technician and occurred in the emergency department of the hospital.  Because she had also been admitted to the hospital's emergency department, she contends the prior incident was sufficiently similar to put UKHA on notice of the possibility that McIntire might sexually assault her.  But regardless of where in the hospital Hennessey was admitted, the fact remains that she alleges that this incident involved a radiology technician and took place in the radiology department, not the emergency department. And she points to no other similarities in the two incidents that would render the alleged conduct in this case foreseeable.

For the reasons we have stated, UKHA was entitled to summary judgment. We affirm.

        Entered for the Court

        Nancy L. Moritz
        Circuit Judge